**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **APRIL SCROGGINS,** | ) | |
| | ) | |
| **Plaintiff-Claimant,** | ) | |
| | ) | **No. 10 CV 50320** |
| **v.** | ) | **Magistrate Judge** |
| | ) | **Iain D. Johnston** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant-Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

April Scroggins (hereinafter, "Claimant") brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying the Claimant's application for disability insurance benefits under Title II of the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment. (Dkt. # 22, 23).

The Claimant argues that the Commissioner's decision denying her application for benefits should be reversed or remanded for further proceedings because the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and is contrary to law. The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons set forth more fully below, the Claimant's motion for summary judgment is granted, and the Commissioner's motion is denied. The matter is remanded.

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

# I. BACKGROUND

A. Procedural History

The Claimant filed an application for disability on June 19, 2007, alleging a disability onset date of September 1, 2006, due to "ADHD, bipolar, substance abuse (cocaine addiction), personality/schizophrenia disorder." R.11, 125. The application was denied. R. 11. The Claimant filed a timely request for a hearing on March 3, 2008. R. 11. The ALJ conducted a hearing on June 10, 2009 in Oak Brook, Illinois. The Claimant and Vocational Expert Thomas Donleavy testified at the hearing. R. 27 – 43, 47 – 51.

On October 8, 2009, the ALJ issued a decision denying the claim for benefits. R. 8 – 23. On December 4, 2009, the Claimant filed a timely request to review the ALJ's decision and for leave to submit new and material evidence. R. 1. On October 12, 2010, the Appeals Council denied the review, making the ALJ's decision the final decision of the Commissioner. Thereafter, the Claimant filed this appeal pursuant to 42 U.S.C. §405(g).

B. Hearing Testimony

1. Claimant

Counsel represented the Claimant at her hearing on June 10, 2009. R. 24. At that hearing, Claimant testified to the following.

The Claimant testified that she had three children, ages 16, 14 and 11. R. 27. She had one year of college education. *Id.* She had no specialized or vocational training and no military service. R. 28. She lived in a house with her husband and sons. R. 28. Although she had not "worked" since September 1, 2006, she owned a re-sale shop for four months. R. 27 – 28, 30. The Claimant did not make money at the re-sale shop; it basically operated in debt. R. 29. Her family helped at the re-sale shop. R. 29, 30. The Claimant did not work the cash register at the

re-sale shop; instead, she would greet the customers and ensure that nobody stole items. R. 29 – 30. She worked about 20 hours per week. R. 30. The Claimant had no regular hours at the re-sale shop. R. 30. Before the re-sale shop, the Claimant worked for the U.S. Postal Service for about 10 years as a rural carrier. R. 31. As a rural carrier, the Claimant was required to lift 75 pounds. R. 31. Because the Claimant injured her back, she was unable to perform the duties of a rural carrier and was required to resign. R. 33. The Claimant testified that she had surgery on her back, after which she was in "extreme pain." R. 33. After the back surgery, the Claimant attempted to perform the duties of a rural carrier but was unable to do so. R. 34. Before working for the Postal Service, the Claimant worked as "an enumerator" for the Census Bureau, and before that she delivered pizzas for Domino's and Pizza Hut. R. 32.

The Claimant testified that as of the time of the hearing, she was receiving injections and taking pain medication for her back, but neither the medication nor physical therapy helped. R. 34. The Claimant testified that the pain medication for her back made her groggy. R. 34.

As of the hearing date, for mental health issues, the Claimant saw her therapist every week and her psychologist every month. R. 35. According to the Claimant, she suffered from "paranoia really bad," and depression. R. 35. The Claimant testified that she had crying spells and went "days on end [when she] just [hid] in [her] room." R. 35. She also testified that she had low self-esteem and suffers from memory loss. R. 35. For example, the Claimant would forget to pick up her children, lost her keys and forgot her appointments. R. 36. The Claimant also indicated that she had lesions on her brain. R. 35.

The Claimant also testified about her past drug use. At this June 10, 2009 hearing, the Claimant testified that she last used cocaine in July 2007. R. 36. According to the Claimant, she

went through formal treatment at Ben Gordon Center. R. 36. The Claimant's drug use resulted in the loss of her home and almost the loss of the re-sale shop. R. 36.

The Claimant provided the following testimony regarding her physical abilities. According to the Claimant, if she were to walk around the block, she would be in unbearable pain. R. 36. At most, she could stand on her feet for fifteen to thirty minutes, and with difficulty, lift twenty pounds. R. 36 – 37. The Claimant testified that she had difficulty sitting; at most she could sit for thirty minutes but she has to adjust herself and move around because she lost feeling in both of her legs. R. 37. The Claimant testified that she avoided stairs as much as possible, and rarely went to the upstairs in her house; she went upstairs perhaps once a month. R. 37. According to the Claimant, she has difficulty bending, stooping, crouching, crawling and kneeling, and these activities were painful. R. 37. The Claimant also lost her balance, but did not yet use a cane. R. 38. At times, the Claimant had difficulty reaching overhead, and if she reaches for objects in front of her, she often drops the object. R. 38. The Claimant testified that the doctor she sees said she drops objects because she had "carpal tunnel really bad in both hands." R. 39. At the hearing, the Claimant notified the ALJ that her EMG testing for carpal tunnel was missing from the file. R. 39. The Claimant testified that she was receiving injections for the carpal tunnel syndrome, and that if the injections did not help, she would have surgery. R. 39.

The Claimant provided the following testimony about her sleep. According to the Claimant, her sleep was "awful," and she slept about three hours a night. R. 39. She testified that despite taking Seroquel, she was "up and down all night." R. 39. The Claimant said that due to her depression she took naps during the day, ranging from two to six hours. R. 39.

The Claimant testified that getting dressed "is not the big problem" and that she took showers, but because of her depression, she did not care anymore. R. 40. According to the

4

Claimant, she was first diagnosed with depression when she was 13 years old. R. 45.  At the time

of the hearing, she was taking 150 milligrams of Lyrica every day and 200 milligrams of

Topomax every day. R. 46.

At the time of the hearing, the Claimant was taking other medications too.  These

medications included 150 milligrams of Seroquel every day; 3 milligrams of Xanex every day;

60 milligrams of Cymbalta every day; 500 milligrams of Vicodin every day, sometimes up to

three times a day; 50 milligrams of Ultram three times a day, and two multi-vitamins. R. 46.

In addition to depression, the Claimant was diagnosed with bipolar disorder and ADHD.

R. 46.  According to the Claimant, she became depressed when people were present, and she

withdrew when she was told what to do or was supervised. R. 46 – 47.

The Claimant testified that she drove her children every day to where they have to go. R.

40.

According to the Claimant, although she went shopping, because of panic attacks, she

would simply leave the shopping cart and return home. R. 40.  She described her panic attacks

like feeling she could not breathe. R. 40.   These panic attacks started within six weeks of the

hearing, and were getting worse; consequently, her doctor increased the dosage of Seroquel as

well as her dosage of Cymbalta. R. 40.  Although her panic attacks were worse in the six weeks

before the hearing, according to the Claimant, she had panic attacks since she was 19 years old.

R. 44 - 45. When she had panic attacks, the Claimant attempted to do breathing and calming

exercises. R. 45.  If those exercises fail, she would use Xanex. R. 45.

The Claimant testified to the following about her ability to perform household chores.

According to the Claimant, with her son's help, she prepared microwave meals, and loaded and

unloaded the dishwasher. R. 41.  Similarly, her son helped her with the laundry, and her son and

husband did yard work, such as mowing the lawn. R. 41.  The Claimant did not remove snow. R. 41. The Claimant used a Swiffer to clean the floors. R. 41.  The Claimant did not remove the garbage; her son did. R. 42.  Again, with her son's help, she would feed the family dogs. R. 43.

The Claimant had no hobbies; she did not craft, collect or play cards or games. R. 42. The Claimant read her Bible, but did not attend church anymore. R. 42. Although the Claimant attended her children's sporting events, she remained in the vehicle because she did not feel comfortable around people. R. 42.

The Claimant testified that she watched some television. R. 43.  But she could not sit long enough to watch an entire episode. R. 43. According to the Claimant, she very rarely used the computer; using it only once a week to check emails. R. 43.

The Claimant provided the following description of a typical day.  Claimant woke at about 9:00 a.m. and would get a cup of coffee and then go back to her bedroom.  She tried to write in her journal to motivate herself. She also tried to read her Bible.  She then would get out of bed again and would have her son help medicate one of the dogs.  Her son also helped let the dogs out of the house.  Upon returning to her room, the Claimant would stay there until about 11:30 a.m. to 12:00 noon.  If she was absolutely required, she would take her children to where they needed to go.  She would then let the dogs back in the house.  She would then enlist her son's help in loading and unloading the dishwasher.  She would then return to her room for a few more hours, and would take a nap.  The Claimant would attempt to go to sleep at night around 10:00 p.m. but would not fall asleep until about 2:00 a.m. R. 43 – 44.

2. Vocational Expert

A vocational expert, Thomas Donleavy, also testified at the hearing.  He testified that he was familiar with the jobs that existed in the Chicago Metropolitan area, and that he used the

Dictionary of Occupational Titles, the Selected Characteristics of Occupations and an assortment of labor market data sources as references. R. 47. Donleavy testified that he reviewed the exhibits and heard Claimant's testimony. R. 47. Donleavy described Claimant's past relevant work history as follows: Claimant was a 20 hour per week "volunteer" at a re-sale shop she owned, which would be categorized as a self-service sales attendant, requiring light exertion. Additionally, Donleavy described Claimant's past work as a letter carrier as a heavy level of exertion, semi-skilled job. Donleavy also identified Claimant's work as a pizza deliverer as being light exertion and unskilled, similar to her temporary work as a census enumerator. R. 48.

The ALJ then posed the following hypothetical questions to Donleavy. First, the ALJ asked Donleavy to consider a person of the Claimant's "age, education, work experience who can lift 20 pounds, 10 pounds frequently, stand and/or walk six hours during an eight hour work day with a sit/stand option at will" (allowing for the person to sit at least six hours during an eight hour workday), that the hypothetical person could "occasionally climb, balance, stoop, crouch, kneel and crawl, but should avoid concentrated exposure to work hazards, such as heights and moving machinery, and that this hypothetical person was unskilled to limited skilled who could have occasional contact with the public, coworkers and supervisors." R. 48 - 49. The ALJ asked Donleavy whether jobs existed for such a person to perform. R. 49. Donleavy said that at least 3000 assembler jobs existed as well as another 3000 "visual inspector" jobs. R. 49.

Second, the ALJ changed the hypothetical to be more restrictive. In the next hypothetical, the ALJ asked Donleavy to consider a unskilled person of the Claimant's "age, education and work experience who can lift and carry 10 pounds occasionally, less than 10 pounds frequently, stand and/or walk a total of two hours during an eight-hour work day," sit at least six hours during an eight-hour work day with a sit/stand at will option, who could

occasionally climb, balance, stoop, crouch, kneel and crawl, but who should avoid concentrated exposure to work hazards such as heights and moving machinery and who would have only occasional contact with the public, coworkers and supervisors. R. 49.  The ALJ again asked Donleavy if jobs existed for such a person to perform. R. 49.  And again Donleavy said that the same jobs (assemblers and visual inspectors) existed. R. 49.

Third, the ALJ posed the same hypothetical as the second but included another limitation; namely, that the hypothetical person would be "off task" for 20 percent of the work day to take a nap or because of "crying spells". R. 49.  Donleavy said that no jobs existed for such a person, particularly a person who was unskilled. R. 50.  According to Donleavy, no jobs would exist for such a person even if the person were to have no contact with the public. R. 50.

Upon examination by the Claimant's attorney, Donleavy clarified that in his answers the "sit/stand option" included a person who was only "able to sit 30 minutes at a time." R. 50. Upon examination by the Claimant's attorney, Donleavy reiterated that if the person were "20 percent off task" (due to mental limitations such as breakdowns or crying spells), no jobs exist for this hypothetical person. R.51.

## C. Medical Evidence

On January 30, 2006, the Claimant was seen at an immediate care center for a low back strain. R. 219.  She was treated with physical therapy and a home exercise program.  At the time, she could stoop, squat, twist and bend, and she had trouble changing positions. R. 221.  The doctor restricted the Claimant so that she was not to lift, push, pull or carry an amount greater than 15 pounds, and avoid repetitive or sustained stooping, squatting, twisting or bending activities for two weeks. R. 272.

On February 26, 2007, the Claimant was evaluated by a psychiatrist. R. 239. At the time, she complained of low back pain for which she was taking Darvocet. R. 239. She was also taking Effexor for depression and Clonazepam for anxiety. R. 239. The depression was related to her pain and job loss in addition to the possible loss of her home. R.239. A mental examination showed that the Claimant could reason and respond in a logical and coherent manner, use good judgment, think abstractly and had recent and remote memory. R. 240. According to the Claimant's reported daily activity, she prepared her children for and drove her children to school. R. 240. She also operated a re-sale shop during the day. R. 240. A doctor diagnosed the Claimant with adjustment disorder with mixed anxiety and depression. R. 240. At this time, there was not a history suggestive of bipolar disorder. R. 240.

On May 23, 2007, the Claimant attended the Ben Gordon Center, where she was provided a comprehensive assessment. R. 470 – 487. She reported being depressed, and using cocaine for about one year. R. 482. She reported being depressed due to her job loss. R. 482.

On June 12, 2007, the Claimant stated that she had used cocaine recently and agreed to inpatient treatment. R. 476. Her thought process and orientation as well as behavior were stable. R. 476.

The next day, the Claimant went to the emergency room because of depression and bipolar disorder. R. 472. The Claimant was not only using cocaine but she was also failing to take her medication for bipolar disorder. R. 472.

From June 13, 2007 through June 18, 2007, the Claimant was admitted to the Provena Saint Joseph Hospital for depression and suicidal ideation. R. 258 – 266. She was not taking her medication at the time. She was diagnosed as being depressed, possessing bipolar disorder and abusing cocaine. R. 260.

On June 29, 2007, the Claimant was told to continue rehabilitation although she had stopped using cocaine since her discharge. R. 473. She was prescribed Seroquel at that time. R. 473.

By July 2, 2007, the Claimant was feeling better. R. 472. At this time, she was taking Seroquel, Lexapro and Xanax. R. 472.

On July 19, 2007, she was diagnosed with bipolar disorder. Her medications were adjusted. R. 563.

By August 2, 2007, the Claimant was more stable. R. 548. However, she complained of being anxious and slow. R. 548. Again, her medications were adjusted.

Sometime in August or September 2007, the Claimant was diagnosed with chronic low back pain, being bipolar, manic and suffering from ADHD. R. 364, 368, 370.

On September 21, 2007, a psychologist performed an examination of the Claimant, finding that although the Claimant was slightly lethargic, she engaged the psychologist when necessary. R. 492. During the examination, the Claimant said her last cocaine use was in August 2007. R. 493. The Claimant identified mood swings, and that she lacked concentration. R. 493. Nevertheless, she displayed appropriate thought processes and her cognitive functioning was intact. R. 494. At that time, the Claimant was diagnosed with moderate depression and moderate anxiety. R. 495.

The progress notes from October to December 2007, showed the Claimant was progressing and more stable. R. 526 – 535.

On August 5, 2008, a brain MRI showed cysts related to the Claimant's L2 – L3 joint, otherwise the lumbar spine was unremarkable. R. 653.

A progress note dated October 10, 2008 indicated that the Claimant's pain in the sacroiliac (SI) joint improved due to injections. R. 726.

An x-ray from December 21, 2008, showed that the Claimant had a normal lumbar spine, but degeneration in the left SI joint. R. 704.  Likewise, an MRI of the Claimant's lumbosacral spine performed on January 5, 2009 showed normal results. R.702.

On January 20, 2009, the Claimant underwent testing because of her complaints that her low back pain was radiating to her right leg. R. 646.  The tests showed sacral radiculopathy in an acute phase. R. 648.

An x-ray of March 2, 2009 showed mild degenerative changes in the SI joint. R. 699.

Progress notes from the Ben Gordon Center, dated March 16, 2009, indicated improvement in the Claimant's depression due to being prescribed Cymbalta. R. 747. She continued taking Topomax, Xanax and Seroquel.  R. 748. According to the treating psychiatrist, the Claimant's behavior was appropriate and speech normal. R. 747.  Although being diagnosed with bipolar disorder and cocaine dependence, the Claimant's condition was stable and her dependence was in "early full remission." R. 747.

On April 28, 2009, a progress note from Rhonda Fried, a nurse practitioner at the Ben Gordon Center, stated that the Claimant's behavior was appropriate; she was functioning; her attitude was cooperative and her thought content and speech were normal. R. 744.  But her affect was constricted and mood was depressed. R. 744.

D. ALJ's Decision

First, the ALJ found that the Claimant met the insured status requirements of the SSA through December 31, 2011. R. 13.  Second, the ALJ found that the Claimant had not engaged in substantial gainful activity since September 1, 2006, despite the Claimant's work at the resale

shop. R. 13. Third, the ALJ found that the Claimant had the following severe impairments: mild degenerative changes of the lumbar spine, anxiety, depressions/adjustment disorder and cocaine abuse. R. 13. Fourth, the ALJ found that these impairments did not meet or equal one of the listed impairments. R. 14. Fifth, the ALJ found that the Claimant had a residual functional capacity as follows: the Claimant was able to perform light, unskilled work, and that this unskilled work could require no more than occasional contact with the public, co-workers and supervisors. R. 15. In making its residual functional capacity determination, the ALJ found that the Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." R. 20. With respect to this finding, the ALJ specifically refused to give Fried's opinion controlling weight because "the treatment notes do not match up with [Fried's] opinion and [Fried] does not discuss the [C]laimant's cocaine use." R. 20.

E. Additional Evidence

After the ALJ denied the Claimant's claim, her attorney appealed to the Appeals Council and submitted a letter from Fried. The letter is undated, but contains a receipt stamp of December 3, 2009. R. 207.

In relevant part, the letter stated that its purpose is to help the Claimant's appeal. R. 207. According to Fried's letter, she treated the Claimant since September 2008. Fried stated that the Claimant had not used cocaine since she had worked with the Claimant, and the Claimant complied with all treatments. Nevertheless, according to Fried's letter, the Claimant continued to "function at a barely minimal level;" the Claimant's life was always in disarray; she

experienced panic attacks, was depressed, displayed poor day-to-day functioning and was

frequently in crisis. Fried stated that the Claimant was depressed, anxious and overwhelmed, and

that the "smallest details of her day to day function appear to occupy hours in order to complete

them." Fried concluded by stating that she could not imagine the Claimant seeking or

maintaining employment, and that employment was not an option for the Claimant. R. 207.

## II. LEGAL STANDARDS

A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision

of the [Commissioner], with or without remanding the cause for a rehearing. 42 U.S.C. §405(g).

This much is clear regarding the standard of review. If supported by substantial evidence, the

Commissioner's factual findings are conclusive. 42 U.S.C. §405(g). If the Appeals Council

denies a request for review, the ALJ's decision becomes the Commissioner's final decision,

reviewable by the district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these

axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is

narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The

district court's review is limited to determining whether substantial evidence supports the

Commissioner's decision and whether the Commissioner applied the correct legal standard in

reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*,

237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record

evidence that would allow a reasonable mind to determine that the decision's conclusion is

supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing

court cannot displace the decision by reconsidering facts or evidence, or by making independent

credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).[2] And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision

---

[2] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record"). Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, 2013 U.S. Dist. LEXIS 72876, *21 (N.D. Ill. 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief.").

B. Disability Standard

        Disability insurance benefits are available to a claimant who can establish that she is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if she is unable to perform her previous work and cannot, considering her age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. §404.1572(b).

        The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's residual functional capacity ("RFC"); and (5) whether the claimant is capable

of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that she cannot perform her past relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

A. Contentions of the Parties

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be remanded for three (3) reasons. First, the Claimant asserts that the ALJ failed to properly analyze the Claimant's back pain, including the source of the back pain and the Claimant's credibility regarding the nature and severity of her back pain. Second, the Claimant asserts that the ALJ failed to give the proper weight to the opinion of Fried, an applied practical nurse, who treated the Claimant at the Ben Gordon Center. Third, relatedly, the Claimant asserts "new evidence," which consisted of a letter authored by Fried, required reversal of the ALJ's decision under sentence six of Section 405(g). 42 U.S.C. §405(g).

The Commissioner contends that the ALJ reasonably considered the Claimant's limitations caused by her back pain, regardless of the source of the back pain, reasonably discounted the Claimant's credibility (in part because of the Claimant's employment at the re-sale shop); and reasonably discounted Fried's evidence regarding the Claimant's disability. Moreover, the Commissioner contends that Fried's letter does not meet the statutory requirements regarding a sentence six remand, and that the Claimant failed to properly seek such a remand.

B. Analysis

Because the central issue in this case involves Fried's opinion, and that issue is dispositive of the appeal, the Court will only address that issue.

The heart of the ALJ's decision rests on its determination whether to credit Fried's opinion and give it controlling weight. The ALJ refused to give Fried's opinion, as a treating nurse, controlling weight for the following reasons. First, the ALJ refused to give Fried's opinion controlling weight because her opinion did not "match up" with "the treatment notes." R. 20. Second, according to the ALJ, Fried did not "discuss the claimant's cocaine use." R.20. Third, the ALJ asserted that Fried "apparently relied quite heavily on the subjective report of symptoms and limitations provided by" the Claimant. R. 20. Relatedly, the ALJ questioned the motives of Fried, stating that the "possibility" existed that Fried's opinion was provided in an effort to help the Claimant or because the Claimant was insistent and demanding in seeking such an opinion. R. 20. Third, the "State Disability Determination Services'" physician's opinion differed from Fried's opinion. R. 20 – 21. Fourth, the Claimant herself was not credible, in the ALJ's opinion for the following reasons: (a) the Claimant's asserted reason for being unable to work conflicted with other testimony,[3] (b) the Claimant's testimony regarding her panic attacks

---

[3] In this discussion, the ALJ's analysis contains non sequiturs, including the conclusion that the Claimant gave conflicting reasons for her inability to work because she collected unemployment. R. 21. Seeking or collecting unemployment benefits can, under the appropriate circumstances, be a relevant factor in determining disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). But the ALJ's decision buried this factor in its discussion that the Claimant had changed her testimony *why* she could no longer work, not that she *could* no longer work. R. 21. According to the ALJ, the Claimant at first asserted that she could no longer work because she injured her back, which made it difficult to lift, which was a requirement of a rural carrier. The ALJ then goes on to note that the Claimant worked at a resale shop. Finally, the ALJ notes that the Claimant claimed she could not work because she cannot "work around supervisors". R. 21. It is difficult to unravel this logical construction. Had the ALJ simply stated that the Claimant first asserted that she could not work because of a back injury but then said she could not work because her mental condition prevented her from taking directions from supervisors, perhaps that argument would make some sense. Of course, a simple response to that argument is that the Claimant's loss of her job as a rural carrier caused her to be depressed and the depression was made worse when others told her what to do. Nevertheless, the syllogism falls apart even further with the inclusion of the fact that the Claimant worked at the resale shop. The un-rebutted testimony was that the Claimant did not

conflicted with other evidence, (c) the Claimant's assertion that she possessed nerve damage in her back was not supported by the medical evidence, (d) the Claimant had a "history of cocaine abuse" and a "history of shoplifting," and (e) the Claimant's daily activities are inconsistent with her complaints of disabling symptoms and limitations. R. 21. Although not entirely clear, the ALJ appeared to have determined that because the Claimant was not credible, Fried's opinion was clouded by its reliance on the Claimant's subjective reporting of symptoms and limitations. Accordingly, the ALJ tied Fried's opinion with the credibility determination of the Claimant.

But before addressing the ALJ's reasons for not giving Fried's opinion controlling weight, the Court must first address two procedural issues.

First, this Court's analysis of the ALJ's credibility issues is hampered by the ALJ's decision's organization. In the decision, the ALJ used phrases such as "as explained throughout this decision" or "as explained elsewhere in this decision" without specifying where the analysis could be found. R. 20 – 21. Worse yet, the decision joined one of those phrases with the phrase "a number of other reasons" and then concluded by saying that "all these reasons" supported the determination. The following is the ALJ's determination regarding Fried's opinion that exemplifies the problem:

> "The residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also supported a finding of 'not disabled.' Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exists *a number of other reasons to reach similar conclusions (as explained throughout*

---

lift any heavy objects at the resale shop. R. 31. Accordingly, the Claimant's work (or "volunteering" as Donleavy termed it) does not conflict with Claimant's assertion that a back injury caused her to stop working. Likewise, she did not report to anybody at the resale shop; indeed, she owned the resale shop. R. 27 – 28. Accordingly, that fact does not contradict the Claimant's testimony. Finally, setting those issues aside, the fact that the Claimant collected unemployment insurance is not contrary to either of the Claimant's reasons *why* she no longer works.

> *this decision). For all these reasons*, the undersigned is unable to give the nurse's opinion controlling weight." R. 21 (Emphasis added.)

Consequently, this organizational structure requires the reviewing court to locate these "other reasons" that are "explained throughout [the] decision" to determine whether the ALJ's rationale, which is supported by "all these reasons," is a sufficient logical bridge.

Second, this Court must address whether Fried, who was an applied practical nurse, is the type of medical professional whose opinion is required to be given "controlling weight." Clearly, the ALJ believed, or at least assumed, Fried's opinion as an applied practical nurse who treated the Claimant could be given controlling weight. But on appeal, in a footnote, the Commissioner asserts that Fried's opinion is not entitled to controlling weight because she is a practical nurse. The Court cannot credit the Commissioner's argument for at least two (2) reasons. First, the ALJ did not base its decision on this rationale. Instead, this is an argument presented for the first time by the Commissioner's attorneys, which this Court cannot consider. *Herron v. Astrue*, 2010 U.S. App. LEXIS 26757, *3 n.1 (9th Cir. 2010) ("Although the evaluation may not have been entitled to controlling weight because a nurse practitioner is not an 'acceptable medical source,' . . . the ALJ did not invoke that reason in rendering his decision. We therefore cannot approve of the ALJ's treatment of the nurse practitioner's evaluation on that ground.") Second, the Commissioner's argument was made in passing in a footnote, which results in waiver. *Perry v. Sullivan*, 207 F.3d 379, 383 (7th Cir. 2000).

Having addressed those preliminary issues, the Court addresses each of the ALJ's bases regarding whether to give Fried's opinion controlling weight.

Fried's opinion and the treatment notes do *not* "match up" well. And the ALJ's decision referenced the treatment notes that were not consistent with Fried's opinion. For example, on May 23, 2007, the Claimant's condition was stable; on June 25, 2007, the Claimant's condition

was improving; on July 19, 2007, although the Claimant was having some difficulties, her medication was adjusted; on July 26, 2007, there was a positive change in the Claimant's behavior and she was improving; on August 2, 2007, the Claimant's mood was stable; on August 15, 2007, the Claimant was making good progress; on August 21, 2007, the Claimant showed some improvement; she was focused, had improved thoughts and gained insight; on September 24, 2007, the Claimant had made progress regarding her impulsivity; on October 3, 2007, the Claimant was stable and meeting her goals; on October 26, 2007, the Claimant's husband said that she had improved; and on December 5, 2007, the Claimant was stable. R. 474-75, 526, 530, 535, 538, 547, 548, 550, 561, 563. The medical records relied upon by the ALJ for 2009 are consistent with this progress.[4] R. 747. The ALJ's decision did not "cherry pick" snippets from the Claimant's medical record. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (ALJ was "cherry-picking" file to find isolated treatment notes to support decision). Instead, the ALJ noted that there was steady improvement during the relevant time period, and those findings are supported by the record. Indeed, the treatment notes contain additional, and perhaps stronger, evidence showing a conflict between the Claimant's subjective reports of her symptoms and limitations, such as a physical altercation between the Claimant and her neighbor. R. 536. During that altercation, the neighbor hit the Claimant twice, the Claimant took the neighbor to the ground, and police were called to the scene. R. 536. The ALJ appears to have considered this incident with a passing reference to "disorderly conduct." R. 21.

But again, the problem with the decision is that it acknowledged those treatment notes earlier in the decision in a separate discussion. Apparently, this is why the ALJ used phrases such as "as explained throughout this decision" and "as explained elsewhere in this decision." R.

---

[4] The record does not contain progress notes for 2008. However, the Claimant did not assert as a basis for reversal that the ALJ failed to supplement the record in this regard.

20, 21. Some courts might find this failure to reference specific treatment notes as a basis for reversal. *See Childress v. Colvin*, 2013 U.S. Dist. LEXIS 94004, * 19 (C.D. Ill. 2013) ("Here, the ALJ failed to support her first reason with any reference to specific treatment notes nor did she explain how those treatment notes undermine [the doctor's] assessment of Plaintiff's limitations."). But because the Seventh Circuit has cautioned that ALJ decisions should not be nit picked, this organizational structure can be overlooked. However, this organizational structure should not be condoned.

Had the ALJ simply stated that the Fried's opinion conflicted with the treatment notes and then provided the examples to support that proposition as well as the other evidence showing the lack of the Claimant's credibility, the review of the decision would be streamlined and the decision would have been affirmed. But setting aside the organizational structure, the ALJ's refusal to give Fried's opinion controlling weight suffers from two critical problems, which cannot be overlooked.

First, the ALJ erroneously based its decision not to credit Fried's opinion on Fried's failure to "discuss the claimant's cocaine use." R. 20. A simple explanation exists for Fried's alleged failure: All the record evidence shows that the Claimant was not using cocaine during the relevant time frame. First, at the hearing, the Claimant testified that she had not used cocaine for about two years. R. 36. Second, the Claimant's testimony was supported by the medical records and treatment notes. R. 473, 508, 747. Indeed, the record reflects that the Claimant passed drug tests during the relevant time period. R. 534. In fact, the ALJ decision indicated that the medical records showed that the Claimant had not used cocaine for nearly two years. R. 17. Accordingly, it is unsurprising that Fried "did not discuss the [Claimant's] cocaine use." Given that the *only* evidence in the record established that the Claimant was *not* using cocaine during

the relevant period, the ALJ could not discredit Fried's opinion for failing to discuss the cocaine use.

Second, the ALJ refused to give Fried's opinion controlling weight because of "the possibility" that Fried's opinion was improperly motivated. R. 20. According to the ALJ, "the possibility always exists" that Fried's opinion was provided to assist the Claimant because Fried sympathized with the Claimant. R. 20. Similarly, according to the ALJ, a "reality" is that the Claimant "might" have been "quite insistent and demanding in seeking supportive notes or reports" from Fried, who provided the note to "avoid unnecessary doctor/patient tension." R. 20. The critical problem with attacking Fried's motive in this way is that *no* evidence whatsoever exists anywhere in the record to support either "the possibility" or "reality" identified by the ALJ. And an ALJ cannot make a credibility determination based on a hunch. *Rogers v. Astrue*, 486 F.3d 234, 247 (6th Cir. 2007). Strangely, the ALJ seemed to even admit a total lack of evidence when it noted that "it is difficult to confirm the presence of such motives." R. 20. The ALJ's rejection of Fried's opinion for these reasons is pure speculation that cannot withstand review. *See Moss v.* Astrue, 555 F.3d 556, 560 (7th Cir. 2009) (conjecture is not a proper basis for ignoring a medical opinion); *see also Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (distinguishing between a logical bridge and "a soaring inferential leap"). The Court recognizes the existence of Seventh Circuit opinions that discuss the claimed phenomena. *See, e.g., Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) But there must be record evidence – other than just a simple conflict between the opinion and some treatment notes – to support the conclusion that a treater cooked up an opinion because of sympathy or to appease a pesky patient. *Criner v. Barnhart*, 208 F. Supp. 2d 937, 957 (N.D. Ill. 2002) (no evidence in record indicating doctor's opinion lacked credibility); *see also Labonne v. Astrue*, 2008 U.S. Dist. LEXIS 67395, *23 – 24

(W.D. Wisc. 2008) (finding that a physician is biased in favor of client was "supported by substantial evidence" when physician backdated onset date to conform with claim despite physician's own conflicting findings) *aff'd* 2009 U.S. App. LEXIS 18338 (7th Cir. 2009); *cf. Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (substantial evidence supported ALJ's doubts of doctor's credibility).

The Commissioner does not assert harmless error in defense of these two missteps.

These two fundamental errors require a remand, despite the fact that the other bases offered by the ALJ to find the Claimant not credible are supported by the record. The Court recognizes that the ALJ properly addressed other bases for discounting the Claimant's credibility, other than its conflict with the medical records. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (court cannot discredit claimant's testimony solely because it conflicts with medical record). The record contains evidence supporting many (but not all) of the other reasons why the ALJ found the Claimant not credible, including that the Claimant purported to have nerve damage in her back but the MRI was negative, R. 702, that the Claimant drives, takes her children to and attends school events, R. 40, 512, and that with help, the Claimant does household chores, R 40- 43, 512.[5]

But the two main assertions for not giving Fried's opinion controlling weight were (a) Fried's alleged failure to address the Claimant's cocaine use, and (b) the allegedly improper motivation for Fried's opinion. Although the Court cannot place a specific percentage as to the weight the ALJ gave to these two erroneous reasons, the ALJ focused on these two reasons at the

---

[5] The ALJ's decision contains misrepresentations of the medical record. For example, the ALJ's decision stated, "It was noted that [the Claimant] could stoop, squat, twist, bend and change positions easily." R.15. But, in fact, the medical record simply noted that the Claimant *could* stoop, squat, twist and bend. R.221. The medical record said nothing about the Claimant being able to do those actions *easily*. Moreover, the medical record stated that the Claimant *had trouble* changing positions. R. 221. Obviously, "having trouble" changing positions is very different than being able to change positions "easily."

outset of its analysis on this issue. These reasons were erroneous and not supported by substantial evidence. In fact, these finding were not supported by any evidence. Accordingly, because of these errors, the ALJ's decision cannot be affirmed.

## IV. CONCLUSION

For the reasons stated above, the Claimant's motion for summary judgment is granted, and the Commissioner's motion for summary judgment is denied. The matter is remanded to the Commissioner.


It is so ordered.


Entered: August 9, 2013

**Iain D. Johnston**
**U.S. Magistrate Judge**